RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0197p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BEVERLY J. GETZ, Executrix for the Estate of Robert
T. Getz,

*Plaintiff-Appellant,*

v.

J. SWOAP, Wood County Sheriff's Office,

*Defendant-Appellee.*

No. 15-3514

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Toledo
No. 3:13-cv-01492—Jeffrey James Helmick, District Judge.

Decided and Filed:  August 16, 2016

Before: GRIFFIN and KETHLEDGE, Circuit Judges; and CLELAND, District Judge.[*]

———————————

## COUNSEL

**ON BRIEF:**  Thomas A. Sobecki, Toledo, Ohio, for Appellant.  Linda F. Holmes, Arlen B. de la Serna, WOOD COUNTY PROSECUTOR'S OFFICE, Bowling Green, Ohio, for Appellee.

———————————

## OPINION

———————————

CLELAND, District Judge.  This Fourth Amendment excessive force claim, through 42 U.S.C. § 1983, arises from the familiar setting of an interaction between an officer and an angry, uncooperative citizen.  The facts illustrate yet again why it is a bad idea to question and argue, and to physically resist an investigating officer's reasonable commands and directions.

—————————

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

Plaintiff-Appellant is the Estate of Robert Getz, substituted for original Plaintiff Robert Getz following his death (which was not related to these facts).  Plaintiff appeals the district court's grant of summary judgment in favor of Defendant-Appellee Deputy Jody Swoap.  We agree with the district court that Deputy Swoap is entitled to qualified immunity under the circumstances, and AFFIRM the judgment of the district court.

## I.  BACKGROUND

### A.  Undisputed Facts

About 7:20 p.m. on November 27, 2011, Deputy Jody Swoap was sitting in his police cruiser on Carter Road outside of Bowling Green, Ohio.  While observing traffic, he saw an oncoming 2004 Chevrolet Cobalt pass him with only one operational headlight.  Robert Getz was driving.  Swoap turned and followed, intending to pull the car over and issue a warning about the defective headlight.  As Getz turned south on Sugar Ridge Road, Swoap switched on his overhead lights, but Getz did not immediately pull over.  Swoap followed until Getz turned into a residential driveway.  Unbeknownst to Swoap, it was Getz's home.

Swoap also turned into the driveway and radioed the dispatcher his location.  The radio log establishes that Swoap's transmission occurred at 7:22 p.m.

Getz did not stop in the driveway but instead passed the house, continuing down the driveway until he reached a barn.  Getz circled around in front of the barn and drove the car back in Swoap's direction, stopping only once he was, according to Swoap, "bumper to bumper to me close enough to where I could not read his license plate."  Swoap radioed in a description of the car and directed his spotlight at the car and driver, recognizing the driver as an older male.  At his deposition, Swoap described Getz at this point as appearing "agitated . . . [h]is mouth and his forehead just looked like he was not happy."

As Swoap was radioing the car's description to dispatch, Getz's car lunged forward a short distance, started to back up, and then angled as though to drive around Swoap's cruiser.  To prevent Getz from leaving the driveway, Swoap moved the cruiser and positioned it so that Getz could not drive around him.  Getz's car continued to approach the cruiser, which was now

blocking the driveway.  Swoap exited the cruiser, stood in the driveway, and yelled for Getz to stop. Getz, however, continued to drive slowly toward Swoap as Swoap repeatedly told Getz to stop.  Eventually, Swoap drew his sidearm and again directed Getz to stop, shut off the car, and exit the vehicle.  This time Getz complied.  Once Getz was out of the car and it was obvious he was not armed, Swoap holstered his gun.

Getz was angry.  Swoap stated that Getz told him to "get the fuck off his property." When Swoap told Getz the reason for the traffic stop and asked Getz for his name, Getz yelled, "Do you know who I am? Everybody knows who I am."  Getz continued to yell and argue until Getz said "fuck this" or "screw this, I'm leaving."  Swoap informed Getz several times that he was not free to leave, but Getz got back in his car.  At this point Swoap called for backup.  Then, with Getz seated in his car gripping the steering wheel, Swoap reached into the car and attempted to remove Getz's left hand from the wheel while ordering him out of the car.  Getz resisted, pushing Swoap away with his shoulder and generally pulling away from Swoap.

Swoap finally pulled Getz out of the car, informed him that he was under arrest, and ordered him to put his hands behind his back.  Swoap again called for backup, this time telling dispatch to "step it up," which Swoap says signaled that "there was a serious potential for somebody to get hurt or there's force being used and I needed somebody there quickly."  Getz refused to put his hands behind his back and said he was going inside the house.  The radio log establishes that Swoap asked dispatch to "step it up" at 7:23 p.m.

When Getz walked toward the front of the police cruiser in the direction of his house, Swoap informed him that he was not allowed to enter the house and that he needed to place his hands behind his back.  Swoap grabbed Getz's upper arm as he told him to place his arms behind his back.  When Getz failed to comply Swoap performed a hip-check maneuver to unbalance Getz, gain control of him, and handcuff him.  In response, Getz turned around and sprawled chest down over the hood of the cruiser gripping opposite ends of the hood, making application of the handcuffs more difficult.  Swoap repeatedly ordered Getz to put his hands behind his back but eventually had to grab Getz's right arm and rotate Getz's body around towards his left arm so that he could place the handcuffs on both wrists.  When Swoap finally managed to handcuff

Getz, he did not check for tightness or double lock the cuffs.[1]  After the cuffs were on, he told Getz to walk to the other side of the cruiser, but Getz continued to resist and again pulled away, saying he was going into the house.  Swoap maintained control and walked Getz to the other side of the cruiser, though Getz was still noncompliant and "locked up his legs . . . [and] his upper body," refusing to follow Swoap's directions.  At 7:24 p.m., Swoap radioed dispatch and reported he had Getz in custody.

At this point Trisha Getz, Robert Getz's daughter, arrived at the scene, and here, Plaintiff's and Defendant's versions of the facts diverge.  The firsthand accounts of the events that followed were provided by Robert's wife and daughter, Trisha and Beverly; Sergeant Timothy Spees, an officer who arrived on the scene; and Deputy Swoap.

## B.  Trisha's Testimony

Trisha recounts seeing Swoap leaning against Getz and pushing Getz's face against the window of the Chevrolet as she pulled up to the house.  When Trisha approached, Swoap told her that Getz was under arrest.  Trisha informed Swoap that she was Getz's daughter.  Around this time Trisha says, "Dad then got to sit down in his car 'cause he said he needed to sit . . . we asked [Swoap] if dad could sit down."  While sitting, Getz told Trisha "these handcuffs are killing me. My hands hurt so bad. Can you just ask him—I have asked him several times to get the handcuffs loosened."  According to Trisha, Getz complained "20 times about his hands" and that she could see his hands bleeding.  She retrieved wipes from her car to clean up blood from Getz's wrists and from a cut on his face.  Swoap offered to call emergency medical services, but Getz and Trisha declined, saying he only needed his oxygen inside the house to treat a breathing condition.

At some point after Trisha retrieved the wipes from her car, she says that Swoap asked her if she lived at the house.  Though she did not live there she told Swoap she did, and Swoap told her to leave, go into the house, or face possible arrest for "invading my crime scene."  Trisha asked Swoap to loosen the handcuffs and then entered the house to inform her mother, Beverly,

---

[1]Double locking prevents the handcuffs from accidentally further tightening, which may happen if an arrestee struggles or adjusts his arm positioning.

of what was happening outside. Trisha asked Beverly to go outside and monitor the situation while she called her brother, Getz's son, Tim. Beverley, before that point, had been unaware of the goings-on in the driveway.

Trisha estimates that 20 minutes passed between her arrival at the scene and her call to Tim. Trisha did not return outside until after her father was released from his handcuffs, but she did testify that once her father came into the house, he told her that when Sergeant Spees arrived, he "went over and took his handcuffs off immediately" and told Getz to "go inside, get yourself cleaned up and get some oxygen."

## C. Beverly Getz's Testimony

Mrs. Getz testified at deposition that she walked outside after Trisha spoke to her and that "Deputy [sic] Spees pulled in shortly after that." Though not part of Mrs. Getz's testimony, both parties agree, based on the police radio log, that Sergeant Spees arrived at 7:29 p.m., approximately four and a half minutes after Getz was arrested. When she and Getz spoke to Spees to ask him to loosen the cuffs, "[Spees] took them right off." Mrs. Getz could not say how long Spees had been there when the handcuffs came off, though she thought "[h]e had just arrived."

## D. Deputy Swoap's Testimony

Deputy Swoap's version of the story differs. At deposition, he stated that he tried to make Getz sit in the back passenger seat of his cruiser but that Getz refused. Trisha arrived around this time but remained by her car. Less than a minute later, Spees arrived and began communicating with Getz. Spees took over primary communication with Getz because they seemed to have a better rapport, though Swoap approached Getz "numerous" times after Spees' arrival to ask if Getz needed medical attention. Each time, according to Swoap, Getz refused emergency medical services and continued to either ignore Swoap or become "argumentative" again. Swoap testified that it was Spees who got Getz to sit down and that he sat in the back of Swoap's cruiser, not his own car. After putting Getz in the cruiser, Spees returned to ask Swoap if he was aware that Getz was bleeding. Swoap said he was not. Shortly thereafter Swoap says

he removed the handcuffs from Getz to allow Getz to use his inhaler. Swoap estimates that Getz was handcuffed "[p]robably less than five [minutes]."

### E.  Sergeant Spees' Testimony

At Sergeant Spees' deposition, he also said he remembered Swoap removing Getz's handcuffs, and estimated that happened "less than ten minutes" after his arrival. Sergeant Spees' testimony differs a bit from Swoap's, in that he remembers both Trisha and Beverly standing outside on the lawn when he arrived.

### F.  Procedural Background

On July 10, 2013 Getz filed a complaint against Deputy Swoap and the Sheriff of Wood County. Specifically, Getz brought three § 1983 claims alleging false arrest, excessive force, and failure to train and supervise. On March 7, 2014, Beverly Getz was appointed executrix of Robert Getz's estate following Robert's death and was substituted as Plaintiff.

Defendants filed a Motion for Summary Judgment on all three claims. Plaintiff did not contest the motion as to the false arrest and failure to train and supervise claims. The district court granted judgment on those claims, and those claims are not before us.

The district court also granted summary judgment on the excessive force claim. The court bifurcated its analysis, examining as two discrete actions first the application of handcuffs and second the maintenance of handcuffs over the arrestee's complaints of pain. First the court held that, given Getz's resistance and in particular his attempts to flee, the application of handcuffs did not constitute unreasonable force violating the Fourth Amendment. As to the maintenance of the handcuffs, the court found that "[t]he relatively short time frame in which Mr. Getz was in handcuffs, coupled with the officer's prompt action in removing them upon a subsequent request after he had subdued Mr. Getz, at worst, falls into a category 'in which qualified immunity operates to shield officers from discretionary, on-the-spot judgments.'" *Getz v. Swoap*, No. 3:13 cv 1492, 2015 WL 1530643, at *12 (N.D. Ohio April 6, 2015) (quoting *Fettes v. Hendershot*, 375 F. App'x 528, 534 (6th Cir. 2010)).

Getz filed a Notice of Appeal on May 5, 2015, challenging the district court's entry of summary judgment in favor of Defendant-Appellee.

## II. STANDARD

We review de novo the district court's grant of summary judgment based on qualified immunity. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 399 (6th Cir. 2009). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

Qualified immunity shields government officials from civil liability in the performance of their duties so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Such immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful. *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). The qualified immunity analysis is a two-step inquiry: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). The "clearly established" step asks whether "existing precedent placed the conclusion" that the defendant violated the constitution under the circumstances "beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Plaintiff argues that Deputy Swoap violated Getz's Fourth Amendment right to be free of excessive force during his arrest. We apply the Fourth Amendment's unreasonable seizure jurisprudence when analyzing such claims. *Morrison*, 583 F.3d at 400. Whether an officer has exerted excessive force during the course of a seizure is determined under an "objective reasonableness" standard. *Id.* at 401 (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

In assessing objective reasonableness, "courts must balance the consequences to the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). While the analysis is fact specific, three factors are of particular relevance: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001) (citing *Graham*, 490 U.S. at 396). We judge the lawfulness of the conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Morrison*, 583 F.3d at 401 (quoting *Graham*, 490 U.S. at 396).

The parties on appeal adopt the approach of the district court in treating as two discrete events the initial application of the handcuffs and the later maintenance of the handcuffs over Getz's complaints of pain. We do the same here.

## A. Initial Handcuffing

We first hold that Swoap did not use excessive force in initially handcuffing Getz. Viewing the facts in the light most favorable to Plaintiff, Swoap's conduct in applying handcuffs was not unreasonable, even though the first *Graham* factor, the severity of the crime, weighs in favor of Getz; an equipment violation or defective headlight is not much more than an administrative matter. When Getz began obstructing official business, and gave cause for a custodial arrest, the confrontation began to escalate and the factor favoring Getz became more dilute. We agree nonetheless that these remain relatively minor infractions.

The second and third *Graham* factors, however, weigh heavily in favor of Swoap's actions. As to the second factor, the threat to the officer or others, Getz's attempts to use his car to effectuate an escape by driving around Swoap's cruiser posed a threat to both Swoap (Getz drove right at Swoap until Swoap drew his firearm) and to the general public should a car chase have become necessary. Concerning the third factor, whether the individual resisted arrest or attempted to flee, Getz resisted arrest and continued to struggle after he was handcuffed. He also repeatedly told Swoap he intended to flee. Getz followed up his verbal threats of flight with

actual attempts to drive away and to enter his house despite Swoap's continual admonishments that Getz was not free to leave.

It is undisputed that Getz was behaving belligerently before and after the handcuffs were applied, that Getz actively resisted Swoap's attempts to place him under arrest, that Getz said that he intended to flee the scene, and that Getz did in fact try to flee the scene. Even Trisha stated at deposition that after Getz was under arrest and handcuffed, he was still yelling at Swoap to "get the fuck off his property." It is also undisputed that Getz continued to lock his legs and refused to follow Swoap's orders after he was in handcuffs.

Swoap admits that he did not double lock or check the handcuffs for tightness. But even assuming the handcuffs were tight enough to cause abrasions, or tightened at some point because of the failure to double lock, a failure to take such additional cautions, in the context of a struggling arrestee now only subdued and partially mollified, is understandable and not all conduct that causes an arrestee discomfort or pain violates the Fourth Amendment. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment."). This is especially true where the subject resists arrest and the use of force is necessary to establish control and restrain the individual. *See Burchett*, 310 F.3d at 944. Further, we have never held that an officer's failure to check for tightness or double lock handcuffs at the moment of arrest is, *per se*, excessive force. The analysis is, as always, fact specific and based on the totality of the circumstances. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).

We hold that, given the arrestee's resistance and general noncompliance, Swoap did not violate the Fourth Amendment when he applied handcuffs without checking for tightness and double locking at the moment of arrest. Qualified immunity applies to this claim.

B. Maintenance of the Handcuffs

The analysis differs once an arrestee has complained that the handcuffs are too tight. In general "[t]he Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison*, 583 F.3d at 401. In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to identify a genuine issue

of material fact that (1) he complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing. *Id*.

Even assuming, *arguendo*, that the alleged facts are sufficient to establish a constitutional violation, a "court must go beyond the question whether the facts are adequate to support a claim that excessively (unreasonably) tight handcuffs, of which the plaintiff complained to no avail, caused injury." *Fettes*, 375 F. App'x at 535 (White, J. concurring in part and dissenting in part). The court must also ask whether the right was clearly established, that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Our precedents would not place a reasonable officer on notice that the conduct in this case, especially in light of Getz's belligerent noncompliance, was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002) (discussing the "notice" or "fair warning" standard).

Our excessive-force-handcuffing cases almost exclusively involve plaintiffs who were compliant and gave officers no reason to delay responding to their complaints, and we have always noted such compliance. *See, e.g.*, *Baynes v. Cleland*, 799 F.3d 600, 604 (6th Cir. 2015) ("[Plaintiff] and [the officers] generally agree that Baynes was cooperative with the officers' instructions and that he was placed in custody without incident."); *Morrison*, 583 F.3d at 398 ("[The arresting officer] acknowledged that [Plaintiff] was entirely compliant with his directions while she was handcuffed and that at no point did she attempt to struggle or flee."); *Kostrzewa*, 247 F.3d at 639 ("There is also no evidence that the plaintiff attempted to flee from the officers, or that he resisted arrest in any way."); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 173 (6th Cir. 2004) (before being handcuffed plaintiff was "not a flight risk and, in fact, was following [the officer's] order" and "was not actively resisting arrest"); *Walton v. City of Southfield*, 995 F.2d 1331, 1334 (6th Cir. 1993) ("[Plaintiff] put her hands behind her back, and [the officer] then put on the handcuffs from behind [Plaintiff] and put her into the police car.").

Even cases in which a noncompliant arrestee resists or flees fail to provide much guidance to officers in defining the contours of the right to be free from excessively tight handcuffing. In many of those cases we found no violation either because officers immediately

responded when the arrestee complained, *see, e.g.*, *Burchett*, 310 F.3d at 945, or because the arrestee failed to complain at all, *see, e.g.*, *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005). Because these claims would have failed even if the plaintiff were compliant, we did not opine as to what effect noncompliance would have on the analysis. To the extent we have addressed cases in which an arrestee disobeys an officer, we have noted that in excessive force cases the fact of noncompliance amounts to a "critical difference" and accordingly condoned greater use of force than we would have had the arrestee been compliant. *See Marvin v. City of Taylor*, 509 F.3d 234, 248 (6th Cir. 2007) ("[W]e find that the Defendants did not violate [Plaintiff's] Fourth Amendment rights . . . because the Defendants acted in an objectively reasonable manner in light of [Plaintiff's] heavily intoxicated state, abusive language, and his resistance to arrest."). In *Marvin* we explicitly distinguished handcuffing cases where the arrestee is compliant and indicated that officers have more leeway in the use of force where an arrestee is noncompliant. *Id*. *Marvin* specifically noted that in judging an officer's actions "it is necessary to consider whether [the arrestee] was resisting arrest." *Id*. at 246.

Here, it is undisputed that Getz attempted to flee, resisted arrest, belligerently continued to disobey orders after his arrest, and continued to address Swoap with abusive language. Our cases indicate that Swoap was entitled to some additional leeway in his approach to Getz as an arrestee. We hold that a reasonably competent officer could conclude that Swoap's actions were lawful. He is therefore immune from suit. *See Malley*, 475 U.S. at 341 (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

Recent decisions such as *Baynes v. Cleland* are not to the contrary. *See* 799 F.3d at 600. In that case we attempted to clarify the line between factual questions for the jury (the reasonableness of an officer's actions) and the question whether a right is clearly established. *Baynes* reversed a district court's grant of summary judgment based on qualified immunity, holding that "the district court turned the factual determinations best left to the jury into factors militating in favor of qualified immunity." *Id.* at 615. That is not the case here. Our focus here is not on the facts, but on the dearth of law putting an officer on notice that his treatment of a belligerent and noncompliant arrestee is unlawful.

The district court was correct in stating that "[t]he relatively short time frame in which Mr. Getz was in handcuffs, coupled with the officer's prompt action in removing them upon a subsequent request after he had subdued Mr. Getz, at worst, falls into a category 'in which qualified immunity operates to shield officers from discretionary, on-the-spot judgments.'" *Getz*, 2015 WL 1530643, at *12 (quoting *Fettes*, 375 F. App'x at 534). The parties agree that Getz was in handcuffs for about four-and-a-half minutes before Spees arrived. Trisha and Mrs. Getz, Plaintiff's primary witnesses, both agree that the handcuffs were removed very shortly after Spees' arrival. Further, it is undisputed that Getz attempted to flee and resisted arrest. He continued to resist and use abusive language towards Swoap for at least some period of time after he was placed in handcuffs.

Plaintiff relies heavily, indeed almost exclusively, on Trisha's equivocal testimony that she "was probably outside 20 minutes" in order to establish that Getz was in handcuffs for at least twenty minutes. This is, Appellant argues, clearly too long for Swoap to ignore Getz and creates a genuine issue of material fact precluding summary judgment. We disagree for two reasons.

First, taking Trisha's other testimony and the undisputed police log together, no reasonable jury could credit Trisha's opinion that she was outside for twenty minutes. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In *Scott* the plaintiff's story was contradicted by a videotape, here it is contradicted by the radio log. *See id.* The police radio log is clear—and no party disagrees—that about four-and-a-half minutes passed between Getz's arrest and Spees' arrival. Trisha's testimony is equally clear that she arrived *after* Getz's arrest but went inside her parents' home *before* Spees' arrival. We must view the facts in light of the objective and undisputed radio log. *Id.* at 380-81 ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.") The radio log "blatantly" contradicts Trisha's recollection. *See id.* at 380.

Appellant tries to overcome the radio log by arguing that a jury could simply believe that Trisha was wrong about being inside the house when Spees arrived. Presumably, Appellant thinks that a jury could conclude that she was actually outside for fifteen or more minutes while Spees was there and just didn't remember Spees' presence or his interactions with her father during that time. But a court is required to draw only reasonable inferences—from specific facts actually alleged—in favor of the non-movant, not credit some facts, discredit others, and confect still more in order to arrive at a story that allows a case to survive summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

Second, even if a reasonable jury were to credit Trisha's testimony, she did not testify that Getz was in handcuffs *and compliant* for twenty minutes. As explained above, the fact of compliance is a "critical difference" in cases such as this. *See Marvin*, 509 F.3d at 248. Even viewing the facts in the light most favorable to Plaintiff, it is clear that Getz was in handcuffs *and compliant* for a very short period of time before the handcuffs were removed. We conclude that, considering Getz's noncompliance, none of our precedents would have put Swoap on notice that his conduct violated the Fourth Amendment. Swoap is entitled to qualified immunity for the maintenance of Getz's handcuffs.

## IV.  CONCLUSION

For the foregoing reasons the judgment of the district court is AFFIRMED.